**UNITED STATES of America, Appellee,**

v.

**Michael Robert FRENCH, Appellant.**

**No. 93–1510.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 14, 1993.

Decided Dec. 15, 1993.

Rehearing Denied Jan. 14, 1994.

Alfredo Parrish, Des Moines, IA, argued, for appellant.

Lester A. Paff, Des Moines, IA, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, CAMPBELL, Senior Circuit Judge,* and LOKEN, Circuit Judge.

RICHARD S. ARNOLD, Chief Judge.

Michael Robert French raises four issues in this challenge to his convictions for conspiracy to distribute marijuana in violation of 21 U.S.C. § 846 and for using or carrying a firearm during a drug transaction in violation of 18 U.S.C. § 924(c). First, French claims that the District Court [1] erred in not allowing an expert witness to testify as to the incentive for certain government witnesses to implicate a defendant falsely in order to receive a sentence reduction. Second, French argues that he was denied due process of law and effective assistance of counsel as guaranteed by the Fifth and Sixth Amendments to the Constitution by the government's failure to reveal inculpatory evidence before trial. Third, French claims that the evidence presented at trial was insufficient as a matter of law to convict him of a § 924(c) violation. Finally, he argues that the District Court erred in determining that he was neither a minimal nor a minor participant in the offense, and that it therefore should have granted him a downward adjustment of four levels in his base offense level. We disagree and now affirm.

## I.

The conspiracy for which French was indicted included several individuals. The central figure was a man named David Lohner, who organized trips to obtain marijuana, kept the books, and kept track of the other co-conspirators' sales. All in all, the conspiracy involved six primary individuals: David Lohner, Leon McCombs, Todd Mulhern, Lenny Poffenberger, Candy Sue McFadden, and the defendant, Michael Robert French. Penny Lohner, David Lohner's wife, kept the books for her husband's enterprise.

The conspiracy began in 1991, when David Lohner arranged to pick up marijuana from Mexico from a man named Ramone (Ray) Chedick for sale in Des Moines, Iowa. Lohner traveled to Tucson, Arizona, on four different occasions to pick up marijuana that had been "fronted" [2] him. The first time Lohner went to Arizona, Chedick did not have marijuana of sufficient quality, and Lohner returned empty-handed. On the second trip to Tucson, Lohner, Poffenberger, McCombs, and French traveled together and returned with approximately 480 pounds of marijuana. French attempted to bring a gun with him on this trip, but the other co-conspirators took it away and, after some argument, forced him to leave the gun in Des Moines. After picking up the marijuana in Arizona and returning to Des Moines, French helped the other co-conspirators unload and weigh the drugs. French did not go to Arizona on either of the last two trips.

As payment for his part in the conspiracy, French had the option of taking either money or marijuana. French chose to take marijuana and received fifteen to twenty pounds. From November of 1991 to December of 1992, David Lohner's ledger indicated that French had sold sixteen pounds of marijuana and that French had another twelve pounds for which Lohner had not received payment. During this period, McCombs saw French give money to Lohner in exchange for marijuana in pound quantities. Additionally, Poffenberger stated that he saw French with marijuana and money several times, and that he (Poffenberger) had been present on several occasions when French had discussed marijuana with Lohner.

As part of their investigation of the conspiracy, the police illegally searched French's residence. During the search, they found a loaded .357 magnum handgun in the bedroom, a speed loader containing twelve to thirteen rounds of ammunition, and a loaded .38 snub-nose revolver in the basement, approximately ten feet from a small cache of marijuana and LSD.

---

* The Honorable Levin H. Campbell, Senior United States Circuit Judge for the First Circuit, sitting by designation.

1. The Honorable Charles R. Wolle, Chief Judge, United States District Court for the Southern District of Iowa.

2. "Fronting" marijuana is a practice whereby the middleman takes the marijuana without first paying for it, sells it, and pays the supplier back out of the proceeds of the sale.

Before trial, the government fully cooperated with discovery and provided defense counsel with a Trial Brief. The Trial Brief mentioned the witnesses the government intended to call and the evidence the government intended to use to prove the conspiracy and the § 924(c) violation. The information contained in the Trial Brief discussed only one witness, Lenny Poffenberger, who would testify that he had seen French with a .357 magnum. The government gave no indication that it had additional information regarding French's possession of any other handgun on other occasions. Arguing that the government's search of French's home had been improper, defense counsel moved to suppress all of the evidence seized in French's home. The suppression motion was granted, and the government was prevented from using the guns in its case-in-chief, although it was able to present much of its evidence about the discovered weapons during cross-examination of French.

At trial, the government offered testimony by Poffenberger that French was in possession of a .32 snub nose rather than a .357 magnum. The government also presented testimony from Todd Mulhern, whose job it was to find a secure place in Des Moines to store the marijuana, that Mulhern had seen French in possession of a .38 snub nose several times at Lohner's house and at the acreage where the marijuana was stored pending sale. Often when Mulhern saw French with a gun, French also carried either money or drugs, and Mulhern testified that on one occasion he had witnessed French threaten a third party with the gun. David Lohner also testified that he had seen the defendant with firearms during drug-trafficking activities. Although the Trial Brief contained none of this information, defense counsel did not object to its admission.

French was convicted of conspiracy to distribute marijuana and of a § 924(c) violation. After trial, the District Court denied French's motion for a new trial and denied him release pending sentencing. The District Court calculated French's base offense level at 28 and sentenced him to 80 months' imprisonment on the conspiracy charge. The Court then sentenced him to 60 months' imprisonment on the § 924(c) violation, to run consecutively. The Court denied the defendant's request for a reduction for being a minimal or minor participant. This appeal followed.

## II.

The only novel issue French presents on appeal is his expert-witness claim. He argues that the District Court erred when it refused to allow him to call an attorney who regularly represents defendants in criminal cases to testify as an expert witness about the impact on witness credibility of the substantial-assistance reductions available under the Sentencing Guidelines. French proposed to have the attorney opine that witnesses who testify after signing plea agreements that contain substantial-assistance provisions are more likely to incriminate the defendant falsely in order to receive the reduction. French argues that he was entitled to the expert's testimony because it was "necessary for adequate representation" as required by 18 U.S.C.A. § 3006A(a) (Supp.1993), and that the District Court's refusal to admit this testimony was in error.

As the District Court stated in its well-reasoned denial of French's motion for a new trial, the "expert's" testimony cannot be "necessary" unless it is admissible. (Order of Jan. 12, 1993, at 5.) The bottom line is that the subject matter of this attorney's proposed testimony is not suitable for expert opinion. Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The District Court should be given broad discretion to determine whether the proffered testimony would be a waste of time, or not helpful to the jury, or both.

Expert testimony is appropriate when it relates to issues that are beyond the ken of people of ordinary intelligence. "Where the subject matter is within the knowledge or experience of laymen, expert testimony is superfluous." *Bartak v. Bell–Galyardt & Wells, Inc.*, 629 F.2d 523, 530 (8th Cir.1980). The District Court decided the attorney's

testimony was unnecessary because it was superfluous and because "a witness may not be impeached by a blanket statement that refers to a group of people...." (Order of Jan. 12, 1993, at 5.)

Given the substantial-assistance provision, it is clearly within the realm of common sense that certain witnesses would have an incentive to incriminate the defendant in exchange for a lower sentence. Expert testimony is not necessary to draw this conclusion. The credibility of witnesses is a determination for the factfinder (in this case the jury) to make. The jury should be allowed to use its common sense. In fact, the judge instructed the jury in this case, at the request of defense counsel, that when jurors assessed the credibility of government witnesses, they could take into account the fact that many of these witnesses stood to receive sentence reductions in return for their cooperation with the government.[3] Additionally, defense counsel cross-examined each government witness on this issue and forcefully argued in her closing that the witnesses were not credible because of the substantial-assistance requirement. The Court's instruction, coupled with defense counsel's own statements, sufficiently communicated to the jury the information it needed to assess the incentives government witnesses had to "stretch or shade the truth in order to obtain sentence reductions." (Order of Jan. 12, 1993, at 6.)

■ French's second argument is that his *Brady* rights, as well as his Sixth Amendment right to effective assistance of counsel, were violated by the government's failure to disclose before trial its additional evidence linking French to handgun possession. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), holds that the prosecution's suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment. French argues that since *Brady* also applies to withheld impeachment evi-

dence, *United States v. Wayne*, 903 F.2d 1188, 1192 (8th Cir.1990), his due-process rights were violated by the government's failure to disclose that it had additional and different evidence proving the § 924(c) violation.

The first answer to this argument is that the so-called surprise evidence was not exculpatory but inculpatory. Since the evidence was inculpatory, the only question is whether the defendant was so surprised that his trial became fundamentally unfair. It is significant that when the government presented Mulhern's testimony that he had seen French with weapons on many different occasions defense counsel made no objection. Similarly, defense counsel did not protest when the government offered evidence that the gun in French's possession was a .32 snub nose rather than a .357 magnum; nor did she protest when David Lohner testified that he had seen French with a gun. If this evidence truly were an unfair surprise, one would expect an objection and a motion for a mistrial or for a continuance. Since neither motion was forthcoming, we suspect, as did the District Court, that defense counsel was not unduly surprised. Finally, it should be noted that defense counsel had the witness list as well as the substance of the witnesses' testimony well before trial and could have interviewed the witnesses herself. Absent a showing of surprise or that the government deliberately withheld information, French was not deprived of a fair trial.[4] French has made no such showing.

### III.

The District Court did not err in refusing French's proffer of an expert on how the substantial-assistance provision of the Sentencing Guidelines might motivate government witnesses to lie. Expert testimony was inappropriate because the subject matter of the proffered testimony was a matter of common sense; therefore, the Court's determination was correct, especially in light of the

---

3. The instruction read, in part:

  In deciding what weight to give the testimony of each of these witnesses [who testified pursuant to a plea agreement], you may also consider whether the witness has an expectation that the testimony presented by the government will result in a departure from the

sentencing guidelines and a reduced sentence....

(Order of Jan. 12, 1993, at 6, quoting Jury Instruction Number 11.)

4. French argues that under *United States v. Johnson*, 982 F.2d 1192, 1198 (8th Cir.1992), the government's failure to disclose its additional

**118**

jury instruction and defense counsel's closing argument. Additionally, the District Court was correct in allowing the government to bring in evidence of handguns other than that specifically contained in the trial brief. The evidence was inculpatory, and French's counsel's failure to object indicates that she was not unfairly surprised by its introduction.

French's other two claims—insufficiency of the evidence and his entitlement to reduction in offense level for a minor or minimal role in the. offense—are without merit and do not require discussion.

Affirmed.

information prevented the defense from being able "to trust in the government's assurances regarding the criminal acts it intends to prove...." In *Johnson*, the government had informed the defendant that it would rely on convictions other than those charged in the indictment to establish the two predicate offenses necessary to support the "series" element for a continuing criminal enterprise charge (CCE). The government proceeded to do so in its case-in-chief, prompting the defendant to testify in order to explain her prior convictions. After the defendant testified, the government indicated its intention to rely only on those offenses charged in the indictment to support the CCE charge. Because the defendant had relied on government assurances to her detriment, this Court affirmed the District Court's grant of a new trial. *Johnson* is clearly inapposite to the present case. French was on notice of the conduct the government intended to prove, because the government presented its evidence during its case-in-chief. Unlike Johnson's counsel, French's counsel did not object, and, unlike Johnson, French was not tricked into testifying by the government's conduct.